NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-2483

LAKE COUNTY BAR ASSOCIATION *v*. MISMAS.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Lake Cty. Bar Assn. v. Mismas,* Slip Opinion No. 2014-Ohio-2483.]**

*Attorney discipline—Conduct adversely reflecting on fitness to practice law— One-year suspension, partially stayed.*

(No. 2013-1248—Submitted October 9, 2013—Decided June 12, 2014.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 12-049.

————————————

**Per Curiam**.

{¶ 1}  Respondent, John Daniel Mismas of Willoughby, Ohio, Attorney Registration No. 77434, was admitted to the practice of law in Ohio in 2004.

{¶ 2}  On June 11, 2012, a probable-cause panel of the Board of Commissioners on Grievances and Discipline certified a complaint filed by relator, Lake County Bar Association, to the board.  Having considered the parties' stipulated facts and the hearing testimony of Mismas and five other

witnesses, a panel of the board found that Mismas had engaged in conduct that adversely reflected on his fitness to practice law by sending inappropriate, sexually explicit text messages to a third-year law student who had interviewed for, and later accepted, a position as a law clerk at his law firm. The panel recommended that Mismas be publicly reprimanded for this conduct.

{¶ 3} The board adopted the panel's findings of fact and misconduct and, despite a modification to the aggravating and mitigating factors found by the panel, adopted its recommendation that Mismas be publicly reprimanded for his misconduct. Having independently reviewed the record, however, we find that Mismas did not just send sexually explicit text messages to a law student he sought to employ—he abused the power and prestige of our profession to demand sexual favors from her as a condition of her employment. Therefore, we conclude that a harsher sanction is warranted and suspend Mismas from the practice of law for one year, with the final six months stayed on conditions.

**Misconduct**

{¶ 4} In November 2011, Mismas contacted Professor J. Dean Carro at the University of Akron School of Law, seeking to hire a student law clerk. Three students responded to his posting. He contacted Ms. C, a female student at the school and scheduled a face-to-face interview for December 9, 2011. From the evening of the interview through December 28, 2011, Mismas and Ms. C exchanged numerous text messages.

{¶ 5} The board found that some of the text messages that Mismas sent to Ms. C on December 9 and 10 were sexually explicit and inappropriate. Notwithstanding the inappropriate content of those messages, Ms. C accepted employment with Mismas's firm on December 11, 2011. On December 22, 2011, Mismas sent Ms. C a text inviting her to travel with him to Washington, D.C. on business. After she informed him that she had a prior commitment and would not

travel with him, Mismas sent her a text stating, "That's strike 1 for you. 3 strikes and you are out." Ms. C resigned her employment the next day.

**{¶ 6}** In January 2012, Professor Carro asked Ms. C about her employment with Mismas and learned of her resignation. When the professor asked for additional information, Ms. C stated that Mismas had acted inappropriately toward her and that she felt uncomfortable continuing in his employ. Shortly thereafter, Professor Carro filed a grievance with relator.

**{¶ 7}** The parties stipulated, and the panel and board found, that Mismas's conduct toward Ms. C violated Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

**{¶ 8}** In order to fully recognize the gravity of the misconduct in this case, however, it is necessary to consider the content of the text messages that Mismas sent to this third-year law student who sought employment as a law clerk in his firm—facts that the parties do not set forth in their stipulations and neither the panel nor the board set forth in its report. Although the conversation began with a general discussion of Ms. C's commitment to Mismas's primary area of practice—asbestos litigation—and the psychological toll that the clients' circumstances can have on those who assist them, it soon took an inappropriate turn.

**{¶ 9}** Mismas advised Ms. C that she would "need to take a few beatings" before she could learn to give one. He rephrased this statement in sexual terms and then asked Ms. C if she had ever engaged in the type of sex act he had referred to. Ms. C told him to stop, stating that they were only speaking metaphorically, but Mismas insisted that he was serious. Ms. C advised him that his question was inappropriate and that she would not answer it. Mismas then told her that there needed to be some level of trust between them saying, "[I]f you can't trust me with personal issues then that's a problem." When she continued to

refuse to answer, he texted, "Just was checking how offended you would get. This job is not for the weak." He indicated that honesty and loyalty were important qualities to him.

{¶ 10} A little before midnight, Mismas began to quiz Ms. C about an arbitration agreement that he had given her to review. The conversation then turned to how Mismas could ensure that Ms. C would be loyal to him. He told her, "I have an idea but your [sic] not going to like it," and stated that she would "bolt" if he said it. After she responded that he had already taken the conversation pretty far and that she had not bolted, he suggested that she perform a sex act for him. Ms. C flatly rejected Mismas's suggestion, but he continued to press the issue. When she told him to stop and urged him to admit that he was joking, he repeatedly refused and insisted that her employment depended on her compliance, telling her, "If you show up at 11 you know what's expected." He further stated, "So its your choice. Ok. I'll be there at 11. If you show up great. You know what you gptt. GoTta do [sic]. If not Good luck to you." At approximately 1:30 a.m., Ms. C gave Mismas one last chance to say that he had just been messing around, but he replied, "Nope. Not kidding."

{¶ 11} At 9:56 that morning, Mismas sent Ms. C another text, suddenly proclaiming that their prior exchange had been a joke after all. When Ms. C expressed her doubts, he apologized and told her that it would not happen again. But at the panel hearing, Ms. C testified that she had believed, and continued to believe, that he was serious about his proposition.

{¶ 12} The following week, Mismas suggested that Ms. C join him at his next out-of-town deposition. And just one week after making that suggestion, he invited her to join him on an overnight trip to Washington, D.C. When Ms. C demurred, stating that she had already accepted an invitation to a judicial function, Mismas belittled her for her rejection and pressured her to go by suggesting that her refusal would have adverse consequences on her employment,

texting her, "That's strike 1 for you. 3 strikes and you are out". The following day, Ms. C resigned her employment.

{¶ 13} On these facts, we agree that Mismas engaged in conduct that adversely reflects on his fitness to practice law in violation of Prof.Cond.R. 8.4(h).

**Sanction**

{¶ 14} When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B).

{¶ 15} The parties stipulated and the panel found that six of the mitigating factors set forth in BCGD Proc.Reg. 10(B)(2) were present, including (a) the absence of a prior disciplinary record, (b) the absence of a selfish or dishonest motive, (c) Mismas's timely good-faith effort to rectify the consequences of his misconduct, (d) his full and free disclosure to the board and cooperative attitude toward the proceedings, (e) his good character and reputation apart from the conduct at issue in this case, as demonstrated by the testimony of three character witnesses and 19 character letters from attorneys, paralegals, court reporters, clients, a judge, and others who know him, and (g) his alcohol dependency.

{¶ 16} Mismas testified that in February 2012, he realized he was an alcoholic. He argued that the inappropriate text messages he sent to Ms. C were meant in jest. He claimed that he had been drinking heavily at the time he sent the sexually explicit texts and that he had no memory of actually sending them. Viewing the texts in retrospect, he said that he was embarrassed by his conduct and referred to it as "disgusting and grotesque." The panel and board found that

he had shown genuine remorse for his actions and appeared to be taking all necessary steps to avoid engaging in similar misconduct in the future.

{¶ 17} Marilyn Wise, a licensed independent chemical-dependency counselor, testified that Mismas began treatment with her in March 2012. She stated that he had successfully completed an approved treatment program, that he continued to attend Alcoholics Anonymous meetings regularly, and that he remained in counseling with her. Although his chemical dependency contributed to his misconduct, she believes that he has "an excellent prognosis of continued sobriety and healthy mental status and should continue unimpeded, the work of the exceptional attorney that he is." Therefore, the panel and board found that Mismas's alcohol dependency qualified as a mitigating factor pursuant to BCGD Proc.Reg. 10(B)(2)(g).[1]

{¶ 18} The only aggravating factor found by the panel was the vulnerability of and resulting harm to the victim of the misconduct. BCGD Proc.Reg. 10(B)(1)(h). The board, however, rejected the panel's finding that the absence of a dishonest or selfish motive was a mitigating factor and instead found that Mismas had acted with a dishonest or selfish motive that qualified as an additional aggravating factor. BCGD Proc.Reg. 10(B)(1)(b).

{¶ 19} In considering the sanctions imposed for comparable misconduct, the panel and board considered *Disciplinary Counsel v. Detweiler*, 135 Ohio St.3d 447, 2013-Ohio-1747, 989 N.E.2d 41. Detweiler had sent a number of inappropriate texts of a sexual nature to a divorce client over a period of several months. On at least two occasions, he indicated that he wanted to engage in

---

[1] For a chemical dependency or mental disability to qualify as a mitigating factor pursuant to BCGD Proc.Reg. 10(B)(2)(g)(i) through (iv), it must be supported by all of the following: (1) the diagnosis of a qualified healthcare professional, (2) a determination that the chemical dependency or mental disability contributed to cause the misconduct, (3) certification of successful completion of an approved chemical-dependency treatment program or a sustained period of successful treatment of the mental disability, and (4) a prognosis from a qualified healthcare professional that the attorney will be able to return, under specified conditions if necessary, to the competent, ethical, and professional practice of law.

sexual relations with his client, and when she ignored his advances, he sent her a nude picture of himself in a state of sexual arousal. *Id.* at ¶ 7. We found that Detweiler's conduct violated Prof.Cond.R. 1.7(a)(2) (prohibiting representation if a lawyer's personal interests will materially limit his ability to carry out appropriate action for the client), 1.8(j) (prohibiting a lawyer from soliciting or engaging in sexual activity with a client unless a consensual sexual relationship existed prior to the client-lawyer relationship), and 8.4(h). *Id.* at ¶ 9-10. In imposing a one-year actual suspension from the practice of law, we found that Detweiler harmed a vulnerable client, acted with a selfish motive, and engaged in a pattern of misconduct that involved a previous sexual relationship with another client. *Id.* at ¶ 2, 12, and 20.

{¶ 20} Contrasting the facts of this case to those of *Detweiler*, the board noted that Ms. C was not a client of Mismas and that he had not been previously sanctioned for similar misconduct as Detweiler had. Citing the presence of multiple mitigating factors, and only one or two aggravating factors, the panel and board recommended that we adopt the parties' stipulated sanction of a public reprimand. We reject this recommendation.

{¶ 21} It is true that Mismas did not direct his inappropriate sexual overtures toward a vulnerable client as *Detweiler* did or engage in inherently dangerous conduct that could place the public at risk of immediate physical harm (like driving under the influence of alcohol). But he did engage in undignified and unprofessional conduct by targeting an aspirant to the profession for sexual harassment.

{¶ 22} Legal clerkships play an important role in developing the practical skills necessary for law students to become competent, ethical, and productive members of the legal profession. Often, the skills, professional relationships, and reputations that students develop in these entry-level positions open the doors to their first full-time legal employment once they graduate and pass the bar exam.

These first jobs can set the course for a new attorney's entire legal career. Attorneys who hire law students serve not only as employers but also as teachers, mentors, and role models for the next generation of our esteemed profession. To that end, we expect that attorneys will conduct themselves with a level of dignity and decorum befitting these professional relationships.

**{¶ 23}** Unwelcome sexual advances are unacceptable in the context of any employment, but they are particularly egregious when they are made by attorneys with the power to hire, supervise, and fire the recipient of those advances. Here, Mismas not only suggested that Ms. C perform sexual favors for him, but he also indicated that her continued employment depended on her compliance with his demands and repeatedly insisted that he was not joking. And even after being rebuffed, he continued to exert his leverage over Ms. C. by pressuring her to travel out of state—and away from her support system—with him. When an attorney engages in sexually inappropriate conduct of this nature, it causes harm not only to the individual to whom the conduct is directed but also to the dignity and reputation of the profession as a whole. Thus, we conclude that Mismas's conduct is more serious than "simply operating a cellphone when under the influence," as his counsel suggests, or sending sexually explicit and inappropriate text messages, as the board found.

**{¶ 24}** Moreover, we reject the parties' stipulation and the board's finding that Mismas made a timely good-faith effort to rectify the consequences of his misconduct. BCGD Proc.Reg 10(B)(2)(c) provides that a respondent's "timely good faith effort to make restitution or rectify consequences of misconduct" may be considered in favor of recommending a less severe sanction. While the record contains substantial evidence of the efforts that Mismas has taken to rectify his alcoholism, his alcohol dependency is a contributing *cause* rather than the *consequence* of his misconduct. And here, the only evidence that Mismas's efforts to rectify the consequences of his actions toward Ms. C consists of several

8

texts that he sent to her following his request for sexual favors—one stating that he was kidding, several others stating that he was sorry and that the conduct would not happen again, and another acknowledging that his conduct was unprofessional.

{¶ 25} But Ms. C testified that when she resigned her employment, Mismas became hostile, put her down for being naïve, and threatened to contact her professors to tell them what a stupid decision she had made. His brief apology to her at the panel hearing and his efforts to have her testimony placed under seal to protect her from future harm, although appropriate, do little to meliorate Ms. C's anxiety, embarrassment, frustration, disappointment, and fear of harm to her professional reputation.

{¶ 26} Based on the foregoing, we conclude that more than a public reprimand is necessary to protect the public from future misconduct. Accordingly, John Daniel Mismas is suspended from the practice of law in Ohio for one year, with the last six months stayed on the conditions that he engage in no further misconduct and continue to comply with all recommendations of his treating medical and psychological professionals. Costs are taxed to Mismas.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

James P. Koerner, for relator.

Charles J. Kettlewell, for respondent.

_____